# WASHINGTON POST COMPANY *v.* O'DONNELL.*

---

LIBEL AND SLANDER; EVIDENCE; PLEADING; PREJUDICIAL ERROR; D RECTION OF VERDICT; PUNITIVE DAMAGES.

1. In an action of libel by a retail dealer against a manufacturer and a newspaper publisher, in which the latter is charged with having published an advertisement of the manufacturer to the effect that a prior advertisement of the dealer of the sale, at a reduced price, of the

---

*Libel and Slander—Injury to Business—Damages.*—The authorities passing upon the measure of damages for libel or slander reflecting on the integrity or responsibility of a merchant are reviewed in a note in 44 L.R.A. (N.S.) 351.

product of the manufacturer, was a fraud, it is not error for the trial court to admit in evidence, on the offer of the plaintiff, a telegram from the manufacturer's agents to the newspaper publisher, guaranteeing immunity if it should publish the manufacturer's advertisement, as the sending of such a telegram and the publication of the advertisement after its receipt tended to show wilfulness on the part of the defendants in the publication of the advertisement; nor is it error for the trial court to admit in evidence in such a case, on the offer of the plaintiff, a telegram and letter sent, before the publication of the alleged libel, by the attorney of the manufacturer to the plaintiff, threatening to proceed against him unless he immediately ceased cutting prices on such product.

2. In an action of libel by a retail dealer against a manufacturing company which claimed that the plaintiff was selling its product at cut rates, an advertisement in a newspaper that the plaintiff's advertisement of the sale of such product at a reduced price was a fraud, advertising matter of the defendant, although subsequent to the publication of the alleged libel, offered in evidence by the plaintiff, is admissible when it is in reply to a plea of justification, and tends to show that the plaintiff had not attempted to infringe the defendant's trademark, or to create a false impression in the minds of the public.

3. The fact that the plaintiff in an action against a newspaper company for having published an alleged libelous advertisement was permitted by the trial court to testify to a conversation he had with the advertising agent of the defendant, to the effect that he, the agent, had received a copy of the advertisement, and had taken it to the business manager of the newspaper, who told him to hold it until the next day, is not prejudicial error, where the business manager had already testified to the same conversation with the advertising agent, without objection.

4. Defamatory words falsely spoken, which prejudice a party in his business, trade, or profession, are actionable *per se.*   (Following *Marino* v. *Di Marco*, 41 App. D. C. 76.)

5. A newspaper advertisement by a manufacturer, reproducing an advertisement by a retail dealer of the product of the manufacturer under the heading, "The above ad. is a fraud," followed by statements to the effect that statements in the dealer's advertisements are false, is libelous *per se.*

6. Where the defendants in an action of libel plead justification, and their evidence does not support the plea, it is not error for the trial court to refuse to instruct the jury, at their request, that if they, or either of them, believed the alleged libelous statements to be true, the jury should award nominal damages.

7. A newspaper advertisement of a company manufacturing razors, reproducing a prior newspaper advertisement of a retail dealer, in which the razors were offered for sale at a reduced price, and charging the dealer with making fraudulent statements in his advertisement, was held, in an action of libel against the manufacturing company and a newspaper company publishing the advertisement, in which action the defendants pleaded justification, to be libelous *per se;* and it was further held on a review of the evidence that there was nothing false or fraudulent in the dealer's advertisement, and that the trial court properly instructed the jury to find a verdict for the plaintiff against both defendants, and properly refused prayers offered by the defendants instructing the jury that they had no right to award punitive damages. (Mr. Justice VAN ORSDEL dissenting.)

8. Punitive damages being given by way of punishment, it is not necessary that there should be actual damage, or something more than nominal damage, to justify their imposition; so that in an action of libel it it is not error for the trial court to refuse a prayer offered by the defendant, to the effect that if the jury should find the damages were nominal, and no more, they could not award punitive damages. (Citing *Russell* v. *Washington Post Co.* 31 App. D. C. 277.)

No. 2720.    Submitted January 7, 1915.    Decided March 1, 1915.

HEARING on an appeal by the defendant from a judgment of the Supreme Court of the District of Columbia, on verdict, in an action of libel.                    *Affirmed.*

The Court in the opinion stated the facts as follows:

This is an action to recover damages for libel, begun by James O'Donnell against the Washington Post Company and the Durham Duplex Razor Company.

Plaintiff is a retail dealer in drugs, etc., in the city of Washington. On Friday, February 9, 1912, the Washington Post Company, at the solicitation of the Durham Duplex Razor Company, published an advertisement which is set out in the declaration. This shows, first, a copy of an advertisement by O'Donnell, which contains a telegram from the attorney of the Durham Duplex Razor Company, stating: "Am instructed by the Durham Duplex Razor Co., to proceed against you, unless you immediately cease cutting prices on Durham

Razors. I hope to receive wire to-day announcing discontinuance."

In the left hand corner of the advertisement, in large letters, are the words "Here's the Way They Try to Stop Us—But They Cannot Do It;" with a hand pointing to the telegram. Underneath this is "Durham Duplex Demonstrator Razors only 31c." This is accompanied with the cut of said razor, with handle in white, marked Durham Duplex. This advertisement of O'Donnell's is republished in the advertisement of the Durham Duplex Razor Company in the Washington Post. Following O'Donnell's advertisement appears in large letters: "The Above Ad is a Fraud!" Then the words following: "O'Donnell is not selling a Durham Duplex Razor for 31 cents, as the wording on the handle indicates; but he is selling a working model known as the Durham Demonstrator for 31 cents. This Demonstrator is put out by the Durham Duplex Razor Company to demonstrate the exceptional qualities of its product—principally Durham Duplex Blades—and it is sold for 35 cents to the public. This price does not pay the expense of manufacturing and handling. The Durham Duplex Razor Company losses money on every sale of these Demonstrator Razors.

"O'Donnell is not stating a fact when he says that the 31 cents is a fair price. A fair margin of profit is allowed each dealer, with the understanding that he advertise and demonstrate the qualities of the Durham Duplex Razor, and any statement that O'Donnell makes to the effect that he is reducing the 'cost of living' by saving you 4 cents on an article that is already sold at a figure below the cost of production is merely a bid for your patronage, and is evidently like the change he has made on the Demonstrator handle—a palpable fraud. Below is a list of legitimate dealers who have taken these Demonstrators to advertise the qualities of our standard razors and blades." Then follows a list of Washington dealers. At the bottom of this advertisement, in large letters, is "Durham Duplex Razor Company." In the left-hand corner is the figure of a Durham Demonstrator razor, with "Durham Demonstra-

tor" in white on a black handle. In the right-hand corner, at the bottom, is the cut of an open box showing Standard Set of Duplex Razors, for sale at $5.

It is alleged that defendants, meaning and intending to mean, and actually conveying the meaning, and being by persons who read the said advertisement to mean, and understood to mean, simply a charge that the plaintiff in respect of his honorable character, reputation, and conduct as a retail druggist was dishonest, deceptive, corrupt, and fraudulent, and otherwise disreputable in the conduct of his said business, and was guilty of deception and fraud on the public, his customers, and on the manufacturer of the said article of merchandise in his advertising said article for 31 cents. That by reason of the said publication, many have been led to believe that plaintiff was and is dishonest, deceitful, and untruthful in the conduct of his said business, and refused to have intercourse and transactions with plaintiff, and plaintiff has been greatly injured and has been damaged in the sum of $50,000. In other counts the declaration charges that the said advertisement was maliciously published, with the intent to injure the plaintiff.

Defendants pleaded not guilty and a special plea. They say that plaintiff ought not to have or maintain his action against them, because, prior to the committing of the supposed grievances in the declaration mentioned, the defendant, the Durham Duplex Razor Company, manufactured and sold to druggists and other retailers two kinds of safety razors, one known as the "Durham Duplex" razor, which retailed at the price of $5 per set, and another known as the "Durham Demonstrator," which is sold to the public for 35 cents; including one Durham Duplex double edge blade; that the said Durham Duplex razor is regularly sold to the public in a set with stropping attachment and six double-edged blades, in a case, and the razor is of a higher quality of workmanship and material than the said Durham Demonstrator; that the said Durham Demonstrator is of an inferior quality, and was put upon the market for the purpose of demonstrating the exceptional qualities of the said Durham Duplex blades, among other things; that the said Durham Duplex

razor and the said Durham Demonstrator are different in appearance in that upon the handle of the Durham Demonstrator, manufactured and sold by the defendant, is and was stamped the words "Durham Demonstrator," which said handle is also of a dark color; whereas upon the handle of the Durham Duplex razor, which is white in color, and of expensive bone ivory or composition, no words whatever appear; yet the said plaintiff notwithstanding the difference between the two classes of razor as aforesaid, and well knowing the same at the time, advertised and published in a newspaper of the District of Columbia the picture of a safety razor, showing the handle thereof to be of a white color, and having stamped on the said handle the words "Durham Duplex," and beneath the reproduction of the said razor advertised that the same would be sold for the sum of 31 cents, thereby intending to convey the idea to the public that the Durham Duplex razor, which in fact retailed at $5 per set, could be purchased from him for 31 cents, and thereby holding out, advertising, and representing to the public, by the wording on the handle of said razor, that he was selling the Durham Duplex razor for 31 cents, whereas in truth and in fact he was secretly intending to dispose of by sale the Durham Demonstrator. And defendants further say that 31 cents is not a fair price for the Durham Duplex razor, or for the Durham Demonstrator; that the said advertised price by the plaintiff is below the cost of manufacture and handling of the Durham Demonstrator, and is thereby below the cost of production of the same. And by reason of the aforesaid the plaintiff conducted himself so as to fraudulently represent to the public at large that he was selling the Durham Duplex razor for the sum of 31 cents, and wrongfully represented that the Durham Duplex razor and the Durham Demonstrator which he was secretly intending to dispose of thereby was worth only 31 cents.

Wherefore the defendants, at the time mentioned in the said declaration, published of and concerning the plaintiff the several words in the declaration mentioned, as it was lawful for them to do for the cause aforesaid.

Issue was joined upon the pleas. The plaintiff introduced

evidence tending to show the publication on the title page of the Washington Daily Post, a paper in large circulation in the District of Columbia; that the copy for said advertisement was sent to the Washington Post by N. W. Ayer & Son, of Philadelphia; that A. D. Marks, business manager of the Post, sent word to plaintiff to come to his office to see a matter that he was interested in. Plaintiff went, and Marks then and there showed him the copy of the said advertisement, and announced his desire to publish it. He was informed by counsel for plaintiff that the matter was libelous, and that the plaintiff would sue him if published. He wanted an arrangement with them whereby the Durham Duplex Razor Company only might be sued. He was told no. Marks said he would take up the matter with the Durham Duplex Razor Company, trying to get that company to indemnify the Post for publication. He was told that he would be sued if the article was published. He said that the agency in Philadelphia were good customers, and he did not like to turn it down because the paper would make money out of it. The telegram from Prescott heretofore copied in the advertisement was read.

The vice president of the Durham Duplex Razor Company, Mr. Thomas C. Sheehan, testified that he wrote the copy of the advertisement, and the same was sent to Ayer & Son as agents of the defendant to the Post. That Ayer & Son told him the Post did not want to run the advertisement without it was satisfactory to the Durham Duplex Company, and the latter would assume responsibility for it. Whereupon witness sent the following telegram:

New York, February 8, 1914.

Washington Post,
    Washington, D. C.:
    You are hereby guaranteed immunity from libel suit in publishing our ad forwarded you by Mr. N. W. Ayer & Son in reply to O'Donnell's ad.

Durham Duplex Razor Co.
    T. C. Sheehan, Vice Pres't.

Sheehan further testified that he had general charge of the matter; that the Durham Duplex Razor Company handled its product in three models; that the razor known as the "Durham Demonstrator" was first manufactured to give away, but the trade said that was hurtful to business, giving away razors in a town where merchants were in the business of selling razors; so the company compromised with the dealers, and put a price on the razors, and withdrew their agents, and gave them to the legitimate agents, being stores in the towns, to sell, making the razor a commercial commodity as a consequence. The razor referred to is marked "not to be sold" on the black handle on the one side, and "to be used with the Durham Duplex blades" on the other side; it was the razor advertised to be sold at retail at 35 cents, and the "not to be sold" was afterwards taken off because dealers objected to it. Thereupon an advertisement streamer was identified by Sheehan, which contained the statement as follows: "While they last—$5.00 style Durham Duplex Razor for 35c." This advertisement of the Durham Duplex Company was objected to on the ground that it was subsequent to the publication of the libel, and was also irrelevant. Court overruled the objection, and exception was taken. Witness said the words "Durham-Duplex" in the above advertisement appear in the same form in which they appear in the cut of the handle of razor shown in that part of the plaintiff's advertisement reproduced in the defendant's alleged libel of February 9, 1912.

Another placard was identified as a demonstration card issued by the authority of the Durham Duplex Razor Company, to which defendant objected because it was subsequent to the publication. This objection was overruled. It contained the following: "Demonstration of the Celebrated Durham Duplex," and then underneath that, to the left: "Durham Demonstrator for 35c. while they last."

Witness testified that his company's idea is to build its trademark, which is "Durham Duplex," and that is what they spend their money on the demonstration for, to demonstrate the trademark; that "Durham Duplex" is a registered trademark, and

"Durham Demonstrator" is registered as well. In the exhibit last above produced, the words "Durham Duplex" appear in their registered trademark form. The witness further testified that the demonstrator is put out to demonstrate the superior qualities of Durham Duplex blades, and the Durham Demonstrator throughout carried the word "Duplex," but it is not a Durham Duplex razor; a Durham Duplex razor costs $1.40 to make, and the other costs 40 cents; the demonstrator is a razor, but not the same razor as the Durham Duplex.

The witness then identified a banner published by the Durham Duplex Razor Company subsequent to the publication of the article complained of in this case, showing the words, "It tells the same story—to demonstrate the Durham Duplex razor with a Durham Demonstrator razor for thirty-five cents." It is exhibited to the public throughout the country and the District of Columbia. It was objected to on the same ground as before. Another banner was identified as issued by the defendant containing the following: "Durham-Duplex Demonstrator Razor 35c," which was objected to on the same grounds. Witness was shown a photograph of a motor car, and testified that it was the photograph of a motor car like that used by the Durham Duplex Razor Company subsequent to the publication of the article complained of, and that the photograph was an exact reproduction of what is on the company's car. He said on cross-examination "You would not paint a black razor if you wanted a man to see it coming down the street. But you will notice that on this handle (referring to the photograph), it does not say 'Durham Duplex' on the handle of that demonstrator razor, as it was put down there." This was objected to also.

Witness identified another piece of advertising matter published since the publication of the article, which was received in evidence over the objection of the defendants on the same grounds as before. It contains the following language:

"The Durham is every man's razor. The price 35c, $2.50 and $5., makes it a razor for every man. The famous Durham-Duplex blade fits them all."

Witness identified a copy of the Literary Digest of November

9, 19.12, which is a widely circulated magazine, and stated that the advertisement on page 871 was published by the Durham Duplex Razor Company, and the same was offered in evidence over the objections of the defendants.   This exhibit, after reproducing the figure of the demonstrator razor, contains the following:

35c.

This is the razor you get for 35c. if you take the coupon below to any of our dealers.   It is equally as good a shaving instrument as our regular razor.

There was next shown the Sunday Magazine of the Washington Post.   An advertisement on the last page of the cover was identified by the witness, and offered in evidence over the objection of the defendant.   He also identified an advertisement on the cover of the Readers Magazine of the Washington Herald of December 13, 1912, which was issued by the defendant company.   In this advertisement occurred the following: "You are one of the 1,000,000 readers of this magazine.   We have a razor for you for 35c. when accompanied by this coupon," signed by the Durham Duplex Razor Company.

Witness then identified a copy of the Home Life Magazine for October, 1913, with a full-page advertisement on the back. This contains the following: "To introduce a Real Razor We are Going to Sell you for Thirty-five Cents a Complete Working Model of our Durham-Duplex $5.00 style Razor Without any Frills, but with one Regular Durham-Duplex Blade in it."

The witness was asked if there was any essential difference between the present Durham Demonstrator and the one on the market in 1912, to which he replied that the only change made was in the material in the construction of the razor, and also the handle was changed by taking the printed matter off at Christmas, 1912, but the article itself was not essentially changed, it is made in the same dies, the handle is essentially changed in that the advertising matter is taken off of it.   The

witness thereupon identified a black-handle razor, on the handle of which appears the words "Durham Demonstrator not to be sold" as among the first manufactured by his company and put out in 1912. He also identified another black-handle razor as representing one of the kind put out by his company until the 1st of September, 1913. He was then shown a photograph, and testified that it was a window display made by the Durham Duplex Razor Company advertising their material.

Telegrams were shown from Ayer & Son to the Washington Post, to "insert the Durham Duplex Razor Ad. February ninth sure. Advertiser guarantees immunity." Also a letter from Ayer & Son confirming this despatch. That this despatch and letter were sent by authority of the Durham Duplex Razor Company.

Witness testified that his company had received numerous complaints from dealers in Washington about the underselling of O'Donnell, and that something must be done to protect them. Letters were read from Washington dealers inclosing copies of O'Donnell's cut-rate advertisements for razors, and asking that something be done. On account of these, defendant telegraphed O'Donnell: "Our price Durham Demonstrator Razors thirty-five cents, and This price protected. Imperative you sell at thirty-five cents, and we trust you will immediately discontinue the ad. and dispose of the remainder of this stock at our established price." Further letters were read from Washington dealers, showing that O'Donnell had continued his advertisement of the Durham Demonstrator Razor for 31 cents. A letter dated January 23, 1912, to O'Donnell, calling his attention to advertising the razors for 31 cents, and stating that it was imperative to sell at 35 cents, and trusting that he would discontinue his advertisement and dispose of the remainder of his stock at established price. No reply was received to the telegram or letter except his advertisement which appears prior to February 9th. "To all of those things he ran additional advertisements as an answer to our letters."

Witness further testified that with reference to three working models of these razors, the original model of the Demonstrator

razor was put out and loaned on the return proposition for men to try the blades. It was made with a white handle, with "Durham Demonstrator" on the handle, and to be used for Durham Duplex blades, and not to be sold; then the razor company made in the neighborhood of a couple hundred thousand with a black fibre handle and a red fibre handle; these were handled by their agents throughout the country, and were put out ostensibly to show the superior quality claimed for the razor and the blades as a demonstrating proposition absolutely. In response to demand of the dealers, it was decided to put the demonstrator razor at 35 cents, selling it to the dealer at 25 cents, giving a profit of 10 cents. The company figures that with the loss that it made it could cut out its advertisements; it was advertising itself, and it could stand the loss between the marketing of the demonstrator razor at 25 cents and what it cost to put it in the dealers' hands. The manufacturing cost was fluctuating at that time. It ran from 20 to 25 cents. Witness said: "We have always said our Demonstrator razor was the Duplex style." It is a Duplex style; it is made along the lines of the Duplex. It is the Durham-Duplex in every way. The angle of shaving is the same. The distance from the blade to the caul is the same. The blade is identical in every way; we only manufacture one blade; but the function of the Demonstrator razor was to demonstrate the superior qualities of our product. I was the originator of the demonstrating scheme, and we never have at any time put on the handle of a Demonstrator razor alone by itself anything beyond the truth that this was a Durham Duplex."

Witness further testified that the original Durham Duplex razor was manufactured by the Durham Duplex Razor Company. The first model carried a razor, a stropping attachment, a silverplated box, half a dozen blades, and a leather case that cost anywhere from 60 to 70 cents. It was put out in this way; the man that bought it paid a $5 bill for it. If we could sell 10,000 sets a month, $50,000 worth of gross business, over the counters, the analysis showed me that before I put out the Demonstrator that on every $5 bill there would be $2 to the dealer and the jobber, leaving us $3. The Durham Duplex

style, Demonstrator razor, is as good a shaving implement in every way, shape, and form as the Durham-Duplex razor.

The defendant offered to take the plaintiff's goods back, but every time he was asked to desist he published another advertisement. Referring to some of defendant's advertisements heretofore offered in evidence, he said these were gotten up to advertise the word "Durham-Duplex," which is the trademark. Referring to one of these, he said: "That is the same thing— a Durham Duplex Demonstrator razor. We picture the razor; We tell the price; it is the Demonstrator." Being asked the distinction between the Demonstrator and the Duplex, witness testified that the word "Duplex" in relation to the razor means that the Duplex razor contains a stropping attachment, a safety attachment, a superior handle, a silver blade shell, half a dozen blades, and a l..ther case; the stropping attachment makes the Duplex feature. You can either strop the blade or use the razor as an old-time razor; that is the standard set; the Demonstrator has none of these characteristics, except the safety attachment.

Plaintiff testified in his own behalf that he is a resident of Washington, forty-three years old, lived here all his life; business as a druggist, and has been a merchant since 1890. He handles drugs, toilet articles, perfumery, soaps, etc., and he sold what is known as the Durham-Duplex razor. That prior to the time of the alleged libel, he continually used the Washington Post for advertising purposes. He identified the contents of a box that came from his store, which was taken therefrom a few days after the advertisement sued on appeared in the paper; that the contents of the box represented the Durham Duplex demonstrator razor he was then selling at the time of the advertisement. That he bought those razors from the Washington Wholesale Drug Exchange at 22½ cents for the razor, which he advertised at 31 cents. Stated that he had other models of this Durham Duplex razor; he had the Derby and the white handle one. He was thereupon shown a Durham Duplex razor; together with the box in which it came, and testified that it came from his place of business about the same time. He testified that on February 3, 1912, he received a telegram from Sydney

I. Prescott, which was reproduced in his advertisement in the Washington Times of February 4, heretofore copied. That he sent to the Times to make a cut of the razor there, sending the box and contents as shown above. He saw the advertisement that appeared in the Washington Post on which he brought this suit, on the day before that advertisement appeared, visiting the office of Mr. A. D. Marks in response to a telephone request from the latter to come down to see him. He had learned that Marks had charge of the advertising department. Marks showed him the copy from which the advertisement was published. Said they had received this advertisement, and were going to run it. Witness told Marks it was a libel, but that he was not a lawyer; that he would call up his lawyer and bring him down there, and they could talk the matter over. Witness called Mr. Baker on the telephone, and Baker appeared. Baker told Marks if he used the article they would be sued for libel. Marks wanted to know, suppose he was indemnified by the people in New York. Baker said he was not the lawyer for the Post, and advised Marks to consult his own counsel. Marks said he received the advertisement from the Ayer advertising concern, and that they got lots of business through the Ayer advertising people. He mentioned that in connection with his desire to publish the advertisement. That when he left Mark's office the latter was calling up the Ayer advertising concern. He said to witness his purpose in so doing was to see if they would indemnify him in case he used this advertisement. Witness testified that in his advertisements he used the name "O'Donnell's." He said that he was selling only Demonstrator razors at 31 cents; that he had purchased the same at 22 cents from the Drug Exchange, and others at 25 cents from the Durham Duplex Razor Company.

Witness has three stores at the present time. February, 1912, had only one. Since this advertisement his places of business have trebled. He has continued to do a large business at his old location on "F" Street, but his profits are much smaller; he has been selling closer. His volume has not increased

what it did years previous; it fell short about $30,000 last year to what it did years previous.

He was asked whether he was worth any less money to-day than you were prior to February, 1912, to which question counsel objected.

Witness testified further, we have from 7,000 to 9,000 customers a day. He could not designate who said he would refuse to deal with him; that nobody ever told him he would or would not deal with him on account of this, but if they would they would not say anything about it, they would not come into his store and say, "I will not deal with you on account of this." They would just stay away. Nobody had refused to purchase articles of merchandise or have any dealings with him in the way of his business, as they were accustomed to deal with him and purchase before. On cross-examination he asked, "Would you want to bring a prescription to my store after seeing that ad in there about being a fraud?"

On cross-examination witness said he does not remember having discussed the case with Fitzpatrick. Does not remember having suggested to Fitzpatrick that this had helped him to get a lot more advertising; did not tell Fitzpatrick that it was a big advertisement and attracted people to his store; did not say it would make his name famous around town, and that a lawsuit would give him a lot more notoriety, and would bring a few thousand people into his store.

Denied that in a conversation with Mr. Cron, advertising man of the Post, when the subject was brought up, that he told the latter to "Go ahead and let the thing go in, it will be a fine piece of advertising for me." The first he heard of the advertisement was the message from Mr. Marks. Cron told witness that he had been up to Mr. Mark's house and showed this advertisement to him, and Mr. Marks said stop it, not to put it in, as it was a libel, and he said he stopped the Post from a libel suit.

On further cross-examination he was asked to state his conversation with Cron. He was proceeding to answer when he was requested to answer yes or no. Whereupon the witness stated that "Mr. Cron came in my store about my advertising. I said,

'Mr. Cron, how can you expect me to give you an advertisement when the paper is libeling me?' He said that the day before this article was published, he was down at the Washington Post, at about 11 o'clock at night. He hurried up to Mr. Mark's house—Mr. A. D. Marks, the general manager of the Post, with this advertisement; he showed the advertisement to Mr. Marks, and Mr. Marks said 'Don't publish it; hold it up.' " That was the night before witness saw Mr. Marks, and this was Mr. Cron of the Post.

Plaintiff then offered Fitzpatrick as a witness, who testified that he is a solicitor for the Durham Duplex Razor Company. He was in Washington in February, 1913, demonstrating, soliciting, making window displays, and making other advertisements; that he had a motor car with him which belonged to the Durham Duplex Razor Company. He identified the photograph, which was heretofore shown in evidence, and also certain streamers. Stated that on this automobile, under the figures "35c", appears the reproduction of a Durham Demonstrating razor; the handle of the razor was a light green; painted thereon through the center of the razor were the words "Durham Demonstrator."

The defendants offered Wade H. Adams, who testified that he is secretary of the Durham Duplex Razor Company. He testified to accounts and orders of people for demonstrator razors, and also the Washington Wholesale Drug Exchange.

Defendants then offered Thomas C. Sheehan, who testified that the Durham Demonstrator razors were first sold to jobbers throughout the country. That on or about the 16th of December, 1911, they advertised in the Saturday Evening Post. Following that, ran another, publishing the names of their agents, and O'Donnell was among the number. Those advertisements contained a list of legitimate dealers who have taken the Demonstrators to advertise the qualities of our standard razors and blades. Was not permitted to state what he meant by the word "legitimate dealers," plaintiff objecting thereto.

A. D. Marks testified that he was business manager of the Washington Post in February, 1912. When the advertisement

was submitted to him, he thought he would send for Mr. O'Donnell, having been good friends for years. Told O'Donnell he had something down in his office from the Durham Duplex Razor Company which might interest him, and O'Donnell came to the office. Had his attorney with him.

"I submitted the ad to him, and told him I did not want to have any unpleasantness about it, or ill feeling between both parties. I wanted to meet the lines of least resistance. I could not get anything out of either O'Donnell or his attorney. If he had told me what they say now, that advertisement would never have gone into the paper. I would not have published the same. They said nothing about the matter being a libel or being dangerous to publish." Witness said he may have suggested that the advertisement came through the advertising agency of N. W. Ayer & Son, and what amount the advertisement would cost, and that he would hate to lose the business, but he is confident that neither O'Donnell nor his attorney said anything about the article being libelous. Denied absolutely that he had been assured of suit in case the Post published the advertisement. Recalls no statement about wanting them to sue the Razor Company alone, instead of the Post. Does not remember any statement of that kind, or that in the attorney's opinion it could not be made. Conversation was limited.

J. P. Fitzpatrick testified for the defendant that he had been in O'Donnell's store several times. Discussed the matter, and Mr. O'Donnell said in substance that he thought the advertisement involved in the suit a fine thing, as it helped him to get a lot more advertising, and that it would make him famous around town, and that a lawsuit would give him a lot of notoriety and would bring a few thousand people into his store.

James A. Cron was introduced. Testified that he was advertising solicitor for the Post, and has been engaged as such for two years. That he knows O'Donnell. He was the person who first received the advertisement published in this case. Saw O'Donnell before it was published. O'Donnell in substance told him to go ahead, let the thing go in, it will be a fine piece of advertising for me. After the publication he went into O'Don-

nell's store quite often.   O'Donnell told him in substance that
he was getting his out of it in advertising.   Referring to his
first conversation with O'Donnell about February 8, he said
O'Donnell said "Hello, sonny, I was just down at your boss's
office."   He said there is a pretty good piece of advertising down
there for me.   I said, "Well, are we going to run it?" and he
said "Sure, you are going to run it.   I want it in."   That is
about all that was said.   We talked business or something like
that.   He mentioned it time and time again.   I go in there two
or three times a week.   I do not know how many times.   He has
mentioned the case at different times.   At one time he said he
had about all the advertising out of it he could get.   He said he
didn't care which way it went.   He was tired of it.

He further testified that the ad was received at the office of
the Post while he was on duty.   Witness's superior was not there
at the time, and he could not locate him, so he called Mr. Marks,
who was located at his home; called him up and told him the
nature of the advertisement.   They also requested a position on
the advertisement, and witness had no authority over position.
They requested a position in a letter, and witness identified the
letter from Ayer & Son inclosing the layout of the advertisement,
with a request for top of the left-hand page.   Witness took it to
Mark's house.

Another witness for defendant, Sydney I. Prescott, testified
that he was a patent attorney and the inventor of the Durham
Duplex razor.   He undertook to demonstrate the difference be-
tween the Durham Duplex razor and the Demonstrator.   De-
scribed the case or standard set of Durham Duplex razor, and
stated:   "The demonstrator is a cheap razor and made of very
cheap materials.   While the handle has a form similar to the
handle of the Duplex Razor, it is of paper and black in color.
The shank and the support extending therefrom are substan-
tially the same except as to material; but there is no other
element made for or sold with the Demonstrator razor; that is
any element which is equivalent to the same, which gives the
Duplex razor its duplex character."

Testified further "that the blades are interchangeable; the

blade may be used with a Duplex razor or with a Demonstrator razor. The purpose of the Demonstrator razor is to demonstrate the quality of the blade and its shaving properties. The shaving properties do not depend entirely upon the material of the blade, nor the formation of its edge, but due to the angularity of the effective edge of the blade in combination with the particular holder in which it is used. The Demonstrator is packed in a very cheap box, a pasteboard box, entirely unlike the box of the Durham Duplex razor. He sent the original of the telegram to O'Donnell."

The plaintiff asked three instructions, which were given by the court.

"First. That as a matter of law the advertisement set forth in the declaration and introduced in evidence, appearing in the Washington Post of February 9, 1912, is a libel on the plaintiff, and that verdict must be for the plaintiff.

"Second. If you find that the publication of the advertisement in the Washington Post of February 9, 1912, was procured by the defendant Durham Duplex Razor Company, and that that advertisement was published by the defendant the Washington Post Company, then you are instructed that, from the publication of that advertisement the law implies malice on the part of the defendants, and that, without regard to whether or not there was actual malice on the part of the defendants in preparing and having published the advertisement in question, the plaintiff is entitled to recover compensation for the injury done to his reputation by the tendency of such publication to bring him into disgrace and disrepute among those who knew him personally or by reputation.

"Third. If you find that the defendants composed and published the advertisement mentioned in the declaration, and appearing in the Washington Post of February 9, 1912, and further find that they did so wilfully, or in reckless disregard of the rights of the plaintiff, or of the injury likely to result to his reputation from the publication of the said article, you are instructed that, in reaching your verdict, you will not necessarily be limited to awarding such damages as you may find will

fairly and reasonably compensate the plaintiff for the injuries sustained by reason of such publication; but you may, in addition thereto, assess against the defendants, by way of punishment and as an example to others, such damages as, in your sound judgment, under all the circumstances as disclosed by the evidence, you believe the defendants ought to pay, not exceeding the amount claimed in the declaration."

The defendant asked certain instructions, which were refused:

"First.  The jury are instructed, as a matter of law, that the truth of alleged defamatory words, if pleaded, is a complete defense to any action of libel.  You are therefore instructed that in this case there has been a plea of justification of the publication of the article complained of because of its alleged truth, and if you find from a preponderance of the evidence that the allegations of the alleged defamatory article are true in substance and in fact, then your verdict must be for the defendants.

"First  (A).  The jury are instructed, as matter of law, that on the evidence and pleadings of this case their verdict should be for the defendants.

"Second.  The jury are instructed that if the defendants, or either of them, through their agents, honestly and in good faith believed the statements contained in the article herein complained of to be true, and had grounds for such belief sufficient to satisfy an ordinarily prudent and cautious person that such statements were true, then the jury may take into consideration all the circumstances of the case, and in the exercise of their discretion award the plaintiff nominal damages merely against either or both of said defendants.

"Third.  The jury are instructed, as a matter of law, that there is no sufficient legal evidence in this case to warrant them in assessing punitive or exemplary damages against the defendants, or either of them.

"Fourth.  The jury are instructed, as a matter of law, that there is no sufficient legal evidence in this case to warrant them in assessing punitive or exemplary damages against the defendant, the Washington Post Company.

"Fifth. The jury are instructed, as matter of law, that if they find for the plaintiff, but further find that the actual damage sustained was nominal and no more, then they need not award punitive damages."

The court refused to give either of the said instructions offered by the defendants, to which exception was taken.

The court then proceeded to instruct the jury that the advertisement is libelous, and they must find a verdict for the plaintiff for something.

In respect of damages they were instructed by the court that the law implies malice on the part of defendants where an article is a libel, without regard to whether or not there was actual malice on the part of defendants, and the plaintiff was entitled to recover compensation for the injury done to his reputation, etc.

He further charged the jury "that there was some evidence tending to show that the Post Company published this as it would any other business advertisement, without any malice or disposition to injure O'Donnell, but for the sake of the money. But also evidence, on the other hand, tending to show that they knew this was a doubtful kind of a document; that they did not like its appearance, and that they did not publish it until after they were to be protected by the advertisers themselves. So it is for you to consider whether or not there was any wilfulness in the case. They claim to have done it simply as a mere matter of business, but to be protected, but the evidence tends to show that they knew it was a document that they ought not to publish, that it was not fair, such an advertisement as that, but that they undertook to get some protection before they did it. It does not make any difference in this case, so far as the damages are concerned here, that the company published this as a business advertisement. They have no right to publish as an advertisement a libel, any more than they have a right to publish it as news, if it is a false thing, or tends to injure somebody who is innocent, and the question of maliciousness is to be gathered, if you gather it at all, from the circumstances applicable to either of these defendants, or both of them.

"Further, that if there should be such facts as would justify the conclusion that the Post was acting without any malice in the matter at all, and that the Durham Duplex Company was maliciously acting, there might be such a thing then as the verdicts being different. It might be more for one than for the other. But I think perhaps you will not come to that point in the case. Here are two defendants, and if they have both been engaged in this publication, if one of them prepared it and got the other to publish it, they would probably both be held equally responsible for its publication, and the doctrine of wilful malice, if found at all, would aply equally to both of them, the one of them doing it simply for pay, the other doing it for some other motive. The publication itself, the fact that it was put in and inserted in the way it was and at the place it was, might allow you to infer maliciousness in both parties."

It was then stated that if it was wilful, then there was another rule of damages.

He then read the third instruction asked for by the plaintiff in regard to damages.

Counsel for the defendants objected to the charge because it suggested that in considering the question of punitive damages they might find against both of the defendants, and also to the suggestion that if the jury found it was malicious or wilful they should find punitive damages.

*Mr. Wilton J. Lambert* and *Mr. Rudolph H. Yeatman,* for the appellants, in their brief cited:  25 Cyc. 370, 371; *Schoefflin* v. *Coffey,* 162 N. Y. 12; *Louisville Times* v. *Lancaster,* 142 Ky. 122; 2 Sutherland, Damages, 3d ed. §§ 392, 407, p. 1113; 13 Cyc. 116; *Boutwell* v. *Marr,* 71 Vt. 1; *Becker* v. *Dupree,* 75 Ill. 167; *Partridge* v. *Brady,* 7 Ill. App. 639; *Hearne* v. *De-Young,* 119 Cal. 670; *Corkings* v. *Meier,* 112 Ill. App. 655; *Washington Gaslight Co.* v. *Lansden,* 172 U. S. 534, 554, 43 L. ed. 543, 551; *Clark* v. *Newsam,* 1 Exch. 130–135; *Burns* v. *Campbell,* 71 Ala. 271–292; *Nightingale* v. *Scannell,* 18 Cal. 315–326; 1 Sedgw. Damages, § 52, p. 84; Sedgw. Damages, § 387, p. 753; 4 Sedgw. Damages, § 1318, p. 2660; *Lay* v.

*Woodworth,* 13 How. 371; *Nichollson* v. *Rodgers,* 129 Mo. 136, 141; *Kenyon* v. *Cameron,* 17 R. I. 122; *Cap. Cons. Co.* v. *Holtzman,* 27 App. D. C. 125, 127; Wigmore, Ev. § 2113; Jones, Ev. 2d ed. § 171; 25 Cyc. 54, and cases cited in note 15; *Stacy* v. *Portland Pub. Co.* 68 Me. 279; *Gambrill* v. *Schooley,* 93 Md. 48.

Mr. *Daniel W. Baker* and Mr. *Frank J. Hogan,* for the appellee, in their brief cited: 24 Ann. Cas. 481; 15 Ann. Cas. 1187; *Bailey* v. *Holland,* 7 App. D. C. 189; *Bauer* v. *O'Donnell,* 229 U. S. 1, 41 App. D. C. 1; *Bergman* v. *Jones,* 94 N. Y. 61; *Brunswick* v. *Harmer,* 14 Q. B. 185; *Burton* v. *Driggs,* 20 Wall. 125; *California Ins. Co.* v. *Union Ex. Co.* 133 U. S. 387; *Camden* v. *Doremus,* 3 How. 515; *Choctaw, O. & D. R. Co.* v. *McDade,* 191 U. S. 64; D. C. Code, §§ 73, 815; *Crane* v. *Bennett,* 177 N. Y. 106; 25 Cyc. 326, 539, 540; *Day* v. *Woodworth,* 13 How. 371; *DeForest* v. *United States,* 11 App. D. C. 458; *District of Columbia* v. *Dietrich,* 23 App. D. C. 577; *District of Columbia* v. *Woodbury,* 136 U. S. 450; 14 Enc. Ev. p. 624; *Evans* v. *Shoonmaker,* 2 App. D. C. 62; *Ferguson* v. *Chronicle Pub. Co.* 72 Mo. App. 466; *Fry* v. *Bennett,* 28 N. Y. 328; *Gaines* v. *Gaines,* 109 Ill. App. 226; *Gambrill* v. *Schooley,* 93 Md. 48; *Gaslight Co.* v. *Lansden,* 9 App. D. C. 530, 539; *Gross Coal Co.* v. *Rose,* 126 Wis. 24; *Hefley* v. *Baker,* 19 Kan. 9; *Hinde* v. *Longworth,* 11 Wheat. 199; *Holmes* v. *Clisby,* 118 Ga. 820; *Hubbard* v. *Rutledge,* 52 Miss. 581; *Hyde* v. *United States,* 35 App. D. C. 479; Jones Ev. 2d ed. § 171; *Knott* v. *Stoddard,* 38 Vt. 25; *Lake Shore R. Co.* v. *Prentice,* 147 U. S. 107; *Louisville Times* v. *Lancaster,* 142 Ky. 122; *Lovejoy* v. *United States,* 128 U. S. 171; *Luzenberg* v. *O'Malley,* 116 La. 699, 41 So. 41; *McDermott* v. *Severe,* 202 U. S. 609, 25 App. D. C. 276; *Maloy* v. *Bennett,* 15 Fed. 371; *Marino* v. *DiMarco,* 41 App. D. C. 76; *Matheson* v. *United States,* 227 U. S. 540; *Milwaukee R. R. Co.* v. *Arms,* 91 U. S. 493; *Moore* v. *Bank,* 13 Pet. 302; *Moore & Hill* v. *Breuinger,* 34 App. D. C. 86; *National Metro. Bank* v. *Lincoln,* 37 App. D. C. 255; *Newbold* v. *Bradstreet,* 57 Md. 38; Newell, Slander & Libel, 2d ed. pp. 195, 838; *Noonan* v. *Caledonia Min. Co.* 121 U. S. 393;

Odgers, Libel & Slander, 5th ed. 1911 p. 181; *Palmer* v. *Mahin,* 120 Fed. 737; *People* v. *Ritchie,* 12 Utah, 180, 42 Pac. 209; *Phillips* v. *Bradshaw,* 52 So. 662; *Pollard* v. *Lyon,* 72 U. S. 225; *Posey* v. *Hanson,* 10 App. D. C. 496; *Post Pub. Co.* v. *Butler,* 137 Fed. 727; *Pouchan* v. *Godean,* 140 Pa. 952; *Press Pub. Co.* v. *Monroe,* 73 Fed. 196; *Prince* v. *Brooklyn Eagle,* 37 N. Y. Supp. 250; *Railroad Co.* v. *Sellers,* 93 Ala. 9; *Richardson* v. *State,* 66 Md. 205; *Rucker* v. *Wheeler,* 127 U. S. 85; *Rudd* v. *Cameron,* 20 Ont. L. Rep. 154; Rule 5, Court of Appeals, §§ 3, 4; *Russell* v. *Post,* 31 App. D. C. 277; *Schoefflin* v. *Coffey,* 162 N. Y. 12, 56 N. E. 502; *Scott* v. *Donald,* 165 U. S. 58; Sedgw. Damages; *Simmons* v. *United States,* 142 U. S. 148; *Smith* v. *Ross,* 31 App. D. C. 348; *Stacy* v. *Portland Pub. Co.* 68 Me. 279; *State* v. *McCoy,* 29 La. Ann. 593; *Steamboat Co.* v. *Davis,* 12 App. D. C. 306; 1 Sutherland, Damages, p. 724; *Sweeney* v. *Irving,* 228 U. S. 233; *United States* v. *McMasters,* 4 Wall. 680; *United States* v. *Philadelphia & R. R. Co.* 123 U. S. 113; *Upchurch* v. *Robinson,* 127 N. C. 127; *Wallach* v. *Macfarland,* 31 App. D. C. 130; *Warner* v. *Press Co.* 132 N. Y. 181; *Washington, A. & Mt. V. R. Co.* v. *Downey,* 40 App. D. C. 147; *Washington, A. & Mt. V. R. Co.* v. *Lukens,* 32 App. D. C. 442; *Watt* v. *Watt,* A. C. 115, 74 L. J. K. B. N. S. 438, 92 L. T. N. S. 480; *White* v. *Nicholls,* 3 How. 266, 11 L. ed 591; Wigmore, Ev. §§ 2113, 2115; *Williams* v. *Conger,* 125 U. S. 397; *Wills* v. *Jones,* 13 App. D. C. 499; *Wilson* v. *Vaughan,* 23 Fed. 229.

Mr. Chief Justice SHEPARD delivered the opinion of the Court:

Numerous errors have been assigned, involving the admissibility of testimony, and the granting of instructions in their order and together.

First. There was no error in admitting in evidence the telegram of the Durham Duplex Razor Company offering indemnity for the publication of the libel. It tended to show wilfulness in the publication of the libel. It tended to show wilfulness

in the publication by both defendants, and the same ruling applies to the telegram and letter of Prescott as attorney for the defendant.

Second. The advertising matter of the Durham Duplex Razor Company was admissible. It is true that it was subsequent to the publication of the libel, but it was in reply to the plea of justification, and tended to show that plaintiff had not attempted to infringe the trademark of the defendant, or to create a false impression in the mind of the public.

Third. No harm was sustained by the defendants by the admission of O'Donnell's statement of Cron's conversation. All that it contained was that Cron had received the copy for the advertisement in the office of the Washington Post, and had taken it to Marks, the business manager, who told him to hold it until next day. Marks himself had testified to this conversation with Cron without objection.

Fourth. The court did not err in instructing the jury that the advertisement was libelous. Defamatory words, falsely spoken, which prejudice a party in his business, trade, or profession, are actionable *per se*. *Marino* v. *DiMarco,* 41 App. D. C. 76, 77, 48 L.R.A.(N.S.) 1214, Ann. Cas. 1914D, 1149, and cases cited; *Newbold* v. *J. M. Bradstreet & Son,* 57 Md. 38, 53, 40 Am. Rep. 426; *Richardson* v. *State,* 66 Md. 205, 210, 7 Atl. 43.

Fifth. There can be no question about the propriety of the court's refusing to instruct a verdict for the defendants upon the testimony in this case.

Sixth. There was no support to the plea of justification of the defendants, and the court did not err in refusing their second instruction to the effect that if defendants, or either of them, believed the statement to be true, they could award nominal damages.

Seventh. As pointed out by the court in its charge, there was nothing false or fraudulent in plaintiff's advertisement. It plainly appeared therefrom that he only offered the Demonstrator razor for 31 cents. There was no confusion with the Durham Duplex razor set in the box, which was advertised at $5.

The Demonstrator was the same kind of razor, and just as good as the regular blades in the set, and was intended to represent it to the public.

Eighth.  There was no error in refusing the instruction denying the right to recover punitive damages.  Nor did the court permit the jury to find a verdict for one kind of damages against one defendant, and another against the other.  There was an intimation in the charge that such might be done, but the jury were advised that it could not be so done, and found a joint verdict against both defendants.

Ninth.  The last instruction was to the effect that if the jury found the actual damages were nominal, and no more, they could not award punitive damages.  It was not error to refuse this instruction.  *Russell* v. *Washington Post Co.* 31 App. D. C. 277, 281, 14 Ann. Cas. 820; *Press Pub. Co.* v. *Monroe,* 51 L.R.A. 353, 19 C. C. A. 429, 38 U. S. App. 410, 73 Fed. 196, 201; *Ferguson* v. *Evening Chronicle Pub. Co.* 72 Mo. App. 462, 466; *Prince* v. *Brooklyn Daily Eagle,* 16 Misc. 186, 37 N. Y. Supp. 250, 253; *Upchurch* v. *Robertson,* 127 N. C. 127, 129, 37 S. E. 157; *Gambrill* v. *Schooley,* 93 Md. 48, 65, 52 L.R.A. 87, 86 Am. St. Rep. 414, 48 Atl. 730.

There are a few authorities that support the proposition of the appellants, but the great weight of authority is against it.  Punitive damages being given by way of punishment, there is no reason to hold that there must be actual damage, or something more than nominal damage, to justify their imposition.  Punitive damages depend not upon the amount of actual damage, but upon the intent with which the wrong was done.

We find no error in the proceeding, and the judgment is affirmed, with costs.                    *Affirmed.*

Mr. Justice VAN ORSDEL dissenting:

I am able to agree with the opinion and judgment of the court.  The court below, at the request of counsel for plaintiff, instructed the jury that, as matter of law, the advertisement was "a libel on the plaintiff, and that the verdict must be for the

plaintiff," leaving only the measure of damage for the consideration of the jury.

An instructed verdict was clearly erroneous. The witness Cron, the advertising solicitor of the Post, to whom this advertisement came in the due course of business, was also the agent of the Post with whom plaintiff had dealt and negotiated when advertising in that paper. Cron testified that, before the advertisement was published, he went into plaintiff's place of business, where the following occurred, "I walked in his store, and he said, 'Hello, sonny, I was just down at your boss's office. He said there is a pretty good piece of advertising he has down there for me.' I said, 'Well, are we going to run it?' He said, 'Sure you are going to run it. I want it in.' That was about all that was said. There were a few other remarks; we talked business or something like that." This conversation was denied by plaintiff, but it raised an issue of fact for the jury, going directly to the right of plaintiff to recover.

It is elementary that, if a person authorizes the publication of that which he considers libelous, he waives all right to complain, and estops himself to claim damages for its publication. In *Schoeplin* v. *Coffey*, 162 N. Y. 12, 56 N. E. 502, the court said: "Proof was given upon the trial which tended to show that the articles printed and published in the several newspapers were sent out by the manager of the Associated Press, with the consent and by the authority of the plaintiff. After this evidence had been received without objection, it was stricken out by the court, and the defendant excepted. If the plaintiff consented to or authorized the publication complained of, he cannot recover for any injury sustained by reason of the publication he authorized. We think the defendant was entitled to have this evidence retained in the case and considered by the jury, and that his exception to the action of the court in striking it out was well taken."

It would be absurd to hold that the statement made to Cron was not notice to the Post. He was the agent of the paper in charge of the advertising matter, and the agent with whom plaintiff was accustomed to deal. Had Cron, instead of taking

the advertisement to Marks, the manager, taken it to plaintiff, and been notified by plaintiff and his attorney that it was libelous, and, if published, the Post would be sued for damages, can it be conceived that my associates would have hesitated to hold that it was notice to the Post on the question of malice, as affecting the measure of damages? Common justice demands that the rule should work both ways. It, however, has not been seriously contended anywhere in this proceeding that Cron's agency was not such as to make this statement, if made, notice to the Post. No objection was made by plaintiff's counsel to the admission of this evidence, and, indeed, none could be made; hence it is too late now to assail it in order to avoid reversible error. It was the keystone of the defense, and failure to object at the proper stage of the trial, or to appreciate its fatal bearing upon plaintiff's prayer for a directed verdict, cannot be corrected here. It was, therefore, for the jury to say whether the statement was, in fact, made by plaintiff. If Cron testified to the truth, it was the end of the case. It was certainly for the jury to pass upon the truth of this testimony.

While counsel for plaintiff, in their brief, try to brush aside this evidence by several pages of argument as to the improbability of plaintiff's having made such a statement, the argument would have been more appropriate in presenting the case to the jury had it been permitted to pass upon the truth or falsity of the testimony regarding the making of. such statement. The truth of Cron's testimony is strongly confirmed, both by plaintiff's subsequent conduct and the testimony of Cron and the witness Fitzpatrick as to similar statements made by plaintiff after the publication was made, to the effect that the publication had been highly advantageous to him in a business way.

Error is assigned in the admission in evidence of advertisements or posters issued by the Durham Duplex Razor Company from one to two years after the publication of the alleged libel. These posters were wholly irrelevant. It is true that they showed that the company was putting on the market a Demonstrator razor, but the advertisement complained of contains that statement. The startling claim is made by counsel for plaintiff,

and apparently accepted by the court, that the evidence was proper to rebut the defense of justification. But this defense was taken from the jury by the court. If this evidence was proper on the question of justification, there must have been an issue of fact on that point, which should have been submitted to the jury.

But the posters in question had no relevancy to the defense of justification. It was not denied by defendant that it was putting out a Demonstrator Razor which was retailed at 35 cents. This statement was contained in the alleged libel. The defense of justification was based upon the charge that plaintiff was advertising a Durham Duplex standard razor, when he was, in fact, selling a Demonstrator razor; and in support of that charge, they point to the inscription on the handle of the razor illustrated in plaintiff's advertisement bearing the trademark of defendant, "Durham Duplex," when, in fact, it appears that those words alone have never appeared on the handle of any razor put out by the defendant company, and were not on the handles of the Demonstrator razors plaintiff was retailing to his customers at the time his advertisement appeared.

It is apparent that these posters, which contained in large colored type defendant's trademark "Durham Duplex," and which defendant's agents testified were issued for the purpose of advertising the trademark, were introduced for the purpose of directing attention from plaintiff's unwarranted and deceptive perversion of the use of defendant's trademark and to impress upon the jury, as was earnestly attempted at the bar of this court, that defendant was putting on the market a Durham Duplex razor of the exact description of the one sold by plaintiff; but nowhere do they connect these posters with a razor bearing the words "Durham Duplex" on the handle.

The vice president of the Duplex Razor Company gave the only testimony bearing upon the policy of the company in selling the Demonstrator razor during the period covered by the posters and at the time of the publication of plaintiff's advertisement and the publication of the alleged libel. He testified as follows: "The witness was thereupon asked if there was any essential

difference in the present Durham Demonstrator razor and the one that was put on the market in 1912, to which he replied that the only change made was in the material in the construction of the razor, and also the handle was changed by taking the printed matter off at Christmas, 1912, but the article itself was not essentially changed, it is made in the same dies; the handle is essentially changed in that the advertising matter was taken off of it. The witness thereupon identified a black handle razor, on the handle of which appears the words 'Durham Demonstrator not to be sold,' as among the first manufactured by his company and put out in 1912, and also identified another black handle razor as representing one of the kind put out by his company up until the 1st of September, 1913." It will be remembered that the alleged libel was published on the 9th of February, 1912.

The same witness, testifying as to the reason for publishing the alleged libel after having received a copy of the advertisement of plaintiff, said: "We had a conversation as to what was best to do; several ads were run by O'Donnell, and this last ad, the one in question, a copy of which came to my desk, I saw that O'Donnell had put 'Durham Duplex' on the handle of our Demonstrator razor, not 'Durham Duplex style,' not a model of the Durham Duplex razor, not to be used with Durham Duplex blades, but he had taken a license with our trademarks that we had spent up to that time something like $750,000 to establish, and had placed it on the handle of a cheap model that we were getting out to demonstrate the character of the Durham Duplex blade. We immediately called the attention of the public to the fact that it was a fraud, in the advertisement that we ran."

It will be observed that the razor sold by the company at the time the posters were put out was only of the same general type as, but of different appearance and of different "material in the construction of the razor" from, the one sold by plaintiff at the time of the publication of the alleged libel. This is important, since, regardless of any contention of counsel, it was the illustration appearing on the handle of the illustrated razor in plaintiff's advertisement which it was sought to verify by these posters. They not only disagree with the illustration, but it

appears that the policy of the company as to the sale of this type of razor had entirely changed. Hence the posters did not properly describe the razor actually sold by plaintiff, and cannot, therefore, be distorted into a confirmation of the truth of plaintiff's illustration, which was the evident purpose sought by their introduction.

This evidence was most prejudicial to defendant. The record discloses that these large advertisements were posted on the blackboard in the trial court-room for impressive exhibition to the jury. If they were exhibited and described to the jury with one half the energy and plausibility which counsel employed in displaying them to this court at the argument, it is not difficult to conjecture the effect they had on the jury in passing upon the sole question left to it by the court,—the fixing of damages. Spectacular methods before a jury usually invite error.

The libel charged on its face shades closely to the line of justification. Plaintiff's own testimony so largely consists of denials of facts testified to by reputable and disinterested witnesses as to approach self-impeachment, and the verdict returned, when viewed calmly in the light of the record, seems exorbitant. Confronted by these irresistible conclusions, I am convinced that errors were committed which have resulted in the perpetration of a great injustice, which should be corrected by a new trial.

A petition for a writ of error to the Supreme Court of the United States was denied March 20, 1915.