ENDY v. BALTIMORE & OHIO R. CO. et al.

No. 890.

Municipal Court of Appeals for the
District of Columbia.

Argued April 4, 1950.

Decided May 18, 1950.

Cornelius H. Doherty, Washington, D. C.,
for appellant.

Stephen Ailes, Washington, D. C., with
whom Laidler B. Mackall, Washington, D.
C., was on the brief, for appellee The
Baltimore & Ohio Railroad Company.

Richard W. Galiher, Washington, D. C.,
with whom Harry Kane, Jr., Washington,
D. C., was on the brief, for appellee Kane
Transfer Company.

Before CAYTON, Chief Judge, and
HOOD and CLAGETT, Associate Judges.

CLAGETT, Associate Judge.

Suit was brought by the railroad against
the owner of the Endy Bros. circus and
the Kane Transfer Company for damages
resulting when a circus wagon became dis-
connected from a transfer company truck-
tractor and demolished a scale house belong-

ing to the railroad. The circus owner denied liability and also cross-claimed against the transfer company for any damage which might be assessed in favor of the railroad against the circus. The amount of damages for the destruction of the railroad's scale house was stipulated. The trial court gave judgment in favor of the railroad against the circus owner only and on the cross-claim held the transfer company not liable. An appeal to this court was taken by the circus owner, but the decision of the trial court in the action between the railroad and the transfer company was not appealed and therefore stands.

The accident occurred just after this particular wagon had been unloaded from a flat car at the Eckington freight yards of the railroad. Connections were placed between the ends of each flat car so that a continuous platform the entire length of a string of flat cars resulted. A ramp was placed from the end freight car to the ground. The circus wagons arrived on the flat cars with the wagon tongues disconnected and stowed beneath the wagons, and, while still on the flat cars, the tongues were attached to the wagons by circus employees who were supposed to insert the tongues into a slot between the front wheels of the wagons and then drop pins which hung by chains from the underpart of the wagons through holes in two places on the wagon bodies and also through holes in the wagon end of the tongues. A rope was supposed to be connected between a fitting on a front corner of each wagon and a circus tractor on the ground. A circus employee guided the wagons by the tongues as the wagons were pulled by the tractor over the flat cars. When each wagon reached the last car, one circus employee guided it down the ramp by the tongue and another circus employee kept it from going too fast by moving the rope to a rear ring of the wagon and acting as a brake. While some of the wagons were then attached to circus tractors and moved to a nearby parking place, this particular wagon was not moved by the circus after it was lowered from the flat car. At this point a transfer company employee attached the forward end of the wagon tongue to a coupling on a transfer company truck-tractor and another transfer employee, driving the truck-tractor, started to move the wagon away from the railroad yards.

After the truck-tractor had gone "about five feet", the driver of this truck-tractor "heard something drop." The wagon end of the tongue had become disconnected from the wagon, and this end of the tongue dropped to the ground. The truck-tractor driver quickly pulled out of the path of the then runaway wagon, and the wagon ran down Eckington Place, crashed into the railroad's brick scale house and demolished the building. Meanwhile, the truck-tractor had stopped on the other side of Eckington Place with the wagon tongue still connected to it. Subsequent examination of the wagon end of the tongue indicated that there had been no break of the fitting on the wagon end of the tongue, and there was testimony that the pin for this end of the tongue was still hanging by its chain from the underpart of the wagon.

The defense of the owner of the circus against the railroad as well as its cross-claim against the transfer company was based upon non-negligence and a written contract for the hauling of the circus wagons and paraphernalia from the railroad cars to the show grounds some distance away. The significant parts of this agreement, to which the railroad was not a party, follow:

"Kane Transfer Co. * * * agree to be responsible for any damage to wagons and paraphernalia of said Endy Bros. Shows, and for accidents of any nature that may be caused through the handling of said wagons and paraphernalia while in transit to and from show grounds and railroad cars, and to assume all responsibility for damage to any equipment, or any used by us in the fulfilling of this contract, and further agree to save and keep the said Endy Bros. Shows safe and harmless against the claims of any person or persons of whatsoever character arising from any act or omission of the undersigned contractor, its agents or employees in the performance of this agreement.

516

"Kane Transfer Co., agree to furnish all necessary licenses and permits for the performance of this contract and to furnish and be responsible for all equipment used therefor, it being expressly agreed and understood that the relationship of the parties hereto is and shall be that of independent contractors. The undersigned contractor shall have full and sole control of the hauling herein provided for, and agree that the same shall be done and performed in a good and workmanlike manner.

"Kane Transfer Co. * * * reserve the right to furnish a man to hitch wagons to trucks, but in case Endy Bros. Shows furnish the man, we will agree that he shall be under the sole direction and control of the undersigned contractor who shall have and hereby accept full responsibility in seeing that the said wagons are properly and safely attached."

■ Two claims of error regarding the admission of testimony should first be noted. One has to do with testimony of a railroad official, admitted over the objection of the transfer company's counsel, that the owner of the circus had stated, following an investigation of the accident, that the accident was the responsibility of the circus and that he would give a check for the amount of the damages. It is unnecessary to discuss this assignment of error because testimony regarding the same conversation and to the same effect was given by another witness, who was in charge of the operation for the transfer company and whose testimony was admitted without objection.[1]

■ The other assignment of error regarding the admission of evidence has to do with the trial court's permitting one of the transfer company's employees to testify that an unidentified circus employee, sometime after the accident, had said "there

was no pin in the tongue of the wagon." We believe this evidence was inadmissible under the hearsay rule; but, while it was possibly open to the construction that no pin had ever been placed through the wagon end of this particular tongue, it was also open to other constructions and could be considered cumulative. Under the circumstances, we believe the error was harmless.

■ On the merits, we hold there was ample testimony to support the finding of the trial court, sitting without a jury, in favor of the railroad against the circus owner. Counsel have argued at length the question of whether the doctrine of *res ipsa loquitur* is applicable, but the trial court made a general finding (as it is permitted to do under Municipal Court rule 48(b)) and made no ruling as to the applicability of the principle here put in issue. In Safeway Stores, Inc. v. West, D. C.Cir., 180 F.2d 25, 26, decided January 23, 1950, Judge Clark quoted from a previous decision, Washington Loan & Trust Co. v. Hickey, 78 U.S.App.D.C. 59, 61, 137 F.2d 677, 679, as follows: "Appellant urges that the case is not within the principle of *res ipsa loquitur*. * * * 'The phrase is nothing but a picturesque way of describing a balance of probability on a question of fact on which little evidence either way has been presented.' The principle behind the phrase is one of inclusion, not exclusion. A plaintiff whose case comes within the principle is entitled to go to the jury, but no plaintiff who makes a probable case is disentitled to go to the jury by the fact that his case does not come within it or goes beyond it. The principle in question is simply that when the cause of an accident is (1) known, (2) in the defendant's control, and (3) unlikely to do harm unless the person in control is negligent, the de-

1. United States v. Crescent Amusement Co., 323 U.S. 173, 65 S.Ct. 254, 89 L. Ed. 160; Patten v. Pinkney, 60 App. D.C. 224, 50 F.2d 989; Arnold v. Collins, 56 App.D.C. 308, 12 F.2d 843, certiorari denied 273 U.S. 717, 47 S.Ct. 109, 71 L.Ed. 856; McReynolds v. W. F. Roberts Co., 52 App.D.C. 48, 281 F. 286; Equitable Surety Co. v. National Capital Bank, 51 App.D.C. 289, 278 F. 1002; Washington Post Co. v. O'Donnell, 43 App. D.C. 215; Lamson v. Andrews, 40 App. D.C. 540; District of Columbia v. Dietrich, 23 App.D.C. 577.

fendant's negligence may be inferred without additional evidence. There is nothing arbitrary or technical about the principle except its name."

In the present case the wagon tongue was attached to the wagon by a circus employee when the wagon was still on the flat car, and the tongue remained attached to the wagon when it was removed from the car by a circus employee. The wagon end of the tongue became detached from the wagon almost immediately after it was pulled by the transfer company's truck-tractor. No one has claimed that the railroad was in anyway to blame or that the damage to its building resulted from an unavoidable accident. Either the circus or the transfer company was negligent. We believe there was sufficient circumstantial evidence to support the trial court's finding that the circus owner was responsible.

We are of the opinion also that the trial court was correct in holding that the agreement between the circus owner and the transfer company did not indemnify the circus owner against this particular accident. It is true that the last quoted paragraph of the agreement was to the effect that even if a circus employee hitched the wagons to the trucks the transfer company accepted "full responsibility in seeing that the said wagons are properly and safely attached." Read as a whole, however, the agreement was clearly intended to include only the safe attachment of the transfer company's truck-tractors to the circus wagons and the hauling to the circus grounds. Here the tongues were attached to the wagons by circus employees while still on the railroad cars and from then on the tongues were as much a part of the wagons as any other attachment. If one of the wheels of a wagon, for example, became detached during the operation, we do not think that the transfer company could have been held responsible, unless something it did caused an accident. A like conclusion was reached in Motor Sales & Service v. Grasselli Chemical Co., 15 La.App. 353, 131 So. 623, where the facts involved were similar.

Affirmed.